UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BLUE CROSS OF IDAHO HEALTH SERVICE, INC., an Idaho corporation<br><br>          Plaintiff/Counterdefendant,<br><br>vs.<br><br>ATLANTIC MUTUAL INSURANCE COMPANY, a New York corporation, ATLANTIC SPECIALTY INSURANCE COMPANY, a New York corporation,<br><br>          Defendants/Counterclaimants. | Case No. 1:09-CV-246-CWD<br><br>**MEMORANDUM DECISION AND ORDER RE:**<br><br>**(1) DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 59)**<br>**(2) PLAINTIFF'S RULE 56(f) MOTION IN OPPOSITION (DKT. 81)**<br>**(3) DEFENDANTS' MOTION TO BIFURCATE AND STAY DISCOVERY ON PLAINTIFF'S BAD FAITH CLAIM (DKT. 87)**<br>**(4) DEFENDANTS' MOTION TO STRIKE (DKT. 90)** |

**INTRODUCTION**

Before the Court are the above enumerated pending motions, all of which are ripe at this time. The Court conducted a hearing on November 10, 2010, on the Motion for Partial Summary Judgment (Dkt. 59) filed by Defendants Atlantic Mutual Insurance

Company and Atlantic Specialty Insurance Company (collectively, "Atlantic"), Plaintiff Blue Cross of Idaho Health Service, Inc.'s ("Blue Cross") Rule 56(f) Motion in Opposition to Atlantic's Motion for Summary Judgment (Dkt. 81), and Atlantic's Motion to Bifurcate and Stay Discovery (Dkt. 87), as well as its Motion to Strike a portion of Blue Cross's response to Atlantic's Memorandum in Support of Summary Judgment (Dkt. 90). At the conclusion of the hearing, the Court took the matters under advisement. In addition, the Court requested further information from the parties regarding the sealing of several exhibits submitted in support of the motions, which the parties are in the process of supplementing. After careful consideration of the parties' arguments, their written submissions, affidavits, and relevant case law, the Court issues the following decision partially granting Atlantic's motion for summary judgment and denying the remainder of the motions.

## BACKGROUND[1]

The relationship between Blue Cross and Atlantic is one of insured and insurer. Blue Cross provides health insurance policies to the general public, and maintains a provider network of physicians for its insureds. In turn, Blue Cross procured several insurance policies covering its business operations from Atlantic Mutual and Atlantic Speciality spanning different time periods. From July 2004 to July 2005, Blue Cross was

---

[1] The Court begins with the general background of this dispute to frame the issues of this case. This background material is not to be construed as the Court's findings of fact. Instead, because of the lengthy nature of its decision, the Court will discuss its factual findings in the context of the arguments presented.

covered by an Atlantic Mutual commercial general liability ("CGL") policy for up to $1 million per occurrence and an Atlantic Mutual umbrella policy for up to $15 million in excess coverage. (Second Am. Compl. Exs. A, B, Dkt. 41).[2] Blue Cross was covered by similar Atlantic Speciality CGL and umbrella policies for the periods July 2005 to July 2006, and July 2006 to July 2007. (Second Am. Compl. Exs. C, D, Dkt. 41).[3] All three Policies are implicated in this matter, as Blue Cross claims coverage under the Policies for the sums it paid to resolve the lawsuit *Verska, et. al. v. Blue Cross of Idaho, Inc.*, (the "Verska Lawsuit").[4]

Two physicians, Verska and Jorgenson (the "Verska Plaintiffs"), filed the Verska Lawsuit against Blue Cross in or about April of 2008, alleging that Blue Cross tortiously interfered with their business relationships and caused them to lose business. The Verska Plaintiffs alleged Blue Cross improperly leaked purportedly damaging information about them and their medical practice to others. Blue Cross notified Atlantic about the lawsuit

---

[2] Atlantic Mutual commercial general liability (CGL) policy No. 768-00-86-88-001, and Atlantic Mutual umbrella policy No. 768-00-86-88-001.

[3] Between July 2005 and July 2006, Blue Cross was covered by Atlantic Specialty CGL policy No. 712-00-72-86-000 for $1 million per occurrence and Atlantic Specialty umbrella - No. 712-00-72-86-00 up to $15 million. Between July 2006 and July 2007, Blue Cross was covered by Atlantic Speciality CGL policy No. 712-00-72-86-001 for $1 million per occurrence and Atlantic Speciality umbrella - No. 712-00-72-86-001 up to $15 million. The Court will refer to the specific policy by name, and collectively to the Policies or Policy when speaking about the policy or policies in general terms.

[4] To distinguish between the lawsuit and the claims made prior to the lawsuit, the pre-lawsuit claims will be referred to as the "Verska Claims," while the claims referenced in the complaint filed by Verska and Jorgenson will be referred to as the "Verska Complaint." The "Verska Lawsuit" is meant to refer to the litigation arising out of the Verska Complaint filed in *Verska, et. al. v. Blue Cross of Idaho, Inc*., which was filed in the Fourth Judicial District in and for Ada County, Idaho.

under the terms of the Atlantic Policies, and now claims Atlantic delayed providing Blue Cross with its coverage position until six months after Atlantic was notified.

Once Atlantic issued its coverage position, Atlantic denied having any defense obligation to Blue Cross under the bodily injury coverage, but acknowledged it might have a defense obligation under its advertising liability coverage. (Ans. ¶32, Dkt. 47.) Subject to a reservation of rights, Atlantic acknowledged a potential defense obligation for the Verska Lawsuit under the personal and advertising injury coverage, while reserving the right to deny any obligation to indemnify Blue Cross because the policies at issue contained exclusions for professional liability, for knowing violations of the rights of another, and for breach of contract. (Atlantic's Response at 2, Dkt. 49.)

Blue Cross alleges that, after Atlantic became involved in the Verska Lawsuit, Atlantic engaged in inappropriate conduct designed to frustrate the litigation, such as disputing Blue Cross's choice of counsel, and imposing litigation management guidelines allegedly not in the Policy, knowing trial was less than six months away. Atlantic admits that it consented to Blue Cross's chosen defense counsel to continue to defend the Verska Lawsuit and to Blue Cross's control of the defense, while it continued to reserve its rights under the Policies. (Ans. ¶ 36, Dkt. 47.)

Sixty days prior to trial, after mounting a vigorous defense, Blue Cross agreed to participate in mediation with the Verska Plaintiffs. Blue Cross purportedly informed Atlantic, and alleges that Atlantic refused to provide settlement authority or contribute to

any settlement. Atlantic, on the other hand, admits that it knew of the mediation, denies that it was asked to contribute to the potential settlement, but admits that it agreed it would be detrimental for Atlantic to participate in the mediation. (Ans. ¶ 47, Dkt. 47.) Atlantic agreed to waive the "consent to settle" provision contained in the Policies. (Ans. ¶ 47, Dkt. 47.) The mediation was conducted on April 20, 2009, and Blue Cross reached a settlement with the Verska Plaintiffs.

From the Verska Lawsuit's inception to mediation, Blue Cross incurred approximately $1 million in defense costs, and sought reimbursement of those costs plus indemnification of the Settlement Amount from Atlantic. Atlantic refused to indemnify Blue Cross or pay its defense fees. (Ans. ¶¶ 50–51, Dkt. 47.) However, on July 22, 2009, pursuant to a reservation of rights, Atlantic paid Blue Cross "$600,000 representing the reasonable and necessary defense costs and expenses incurred by Blue Cross" in connection with the Verska Lawsuit, which was equivalent to 60% of Blue Cross's defense costs. (Ans. ¶ 52; Countercl. ¶ 19, Dkt. 47.) Blue Cross contends that Atlantic has wrongfully withheld payment for the additional defense costs and settlement sums under the Atlantic Policies, breached its agreements with Blue Cross, and engaged in bad faith.

Blue Cross filed this action against Atlantic[5] seeking a declaratory judgment that one or both defendants owe an indemnity obligation under the Policies for the settlement

---

[5] Since the filing of this action, the parties provided notice to the Court on October 19, 2010, that Atlantic Specialty Insurance Company has become insolvent. (Dkt. 106.) Atlantic Specialty Insurance Company's insolvency does not affect the claims made by and against Atlantic Mutual Insurance Company.

and the remaining attorney fees that Blue Cross paid to resolve the Verska Lawsuit. Blue Cross's Second Amended Complaint, filed on March 12, 2010, (Dkt. 41), adds claims for damages for breach of contract for failure to honor obligations and policy terms, for untimely payment of attorney fees and settlement amounts, and for bad faith.

Atlantic filed its Answer and Counterclaim on April 2, 2010, (Dkt. 47), denying that either defendant is liable for the sums Blue Cross claims Atlantic owes, and seeking its own declaratory judgment that Blue Cross forfeited any coverage that it might have had under any Atlantic Policy because Blue Cross failed to comply with the policy provisions concerning notice of suit. In addition, Atlantic requested reimbursement of the $600,000 it paid to Blue Cross for Blue Cross's defense costs under a reservation of rights and under a theory of unjust enrichment.

In response to the Counterclaim, Blue Cross filed a Motion to Dismiss (Dkt. 48) pursuant to Fed. R. Civ. P. 12(b)(6), seeking to dismiss Atlantic's counterclaim for declaratory judgment and reimbursement on the grounds that there is no insurer right of reimbursement under the terms of Atlantic's policies. The Court granted Blue Cross's Motion to Dismiss with respect to Atlantic's claim for reimbursement on August 23, 2010, (Dkt. 76), providing Atlantic leave to file an amended counterclaim that did not seek reimbursement. Atlantic filed its Amended Counterclaim on September 3, 2010. (Dkt. 84.)

Atlantic vehemently denies it delayed providing Blue Cross with its coverage position, and denies any improper conduct. Atlantic's two count Amended Counterclaim restates its claim for declaratory judgment on the grounds that Blue Cross forfeited coverage under the Policy by its late notice, failure to cure, and lack of excuse for its non-compliance. The second count of the Amended Counterclaim seeks a declaration that Blue Cross waived and/or is estopped from claiming coverage under the Policies by its failure to comply with the notice of suit provisions.

Atlantic's Motion for Partial Summary Judgment requests an order granting partial summary judgment on Atlantic's First, Sixth, Eighth, Thirteenth, Fourteenth, Fifteenth and Sixteenth Affirmative Defenses. (Atlantic's Mem. at 1, Dkt. 61.) Specifically, Atlantic's defenses assert that: (1) Blue Cross's failure to provide timely notice of the Verska Plaintiffs' claims or the Verska Lawsuit constituted a forfeiture of coverage; (2) Atlantic has no obligation to reimburse Blue Cross's pre-tender defense costs because Blue Cross voluntarily retained the firm Hawley Troxell Ennis & Hawley in 2008 without Atlantic's consent; (3) the Verska Claims did not constitute an occurrence under the policy because they were not caused by an accident, and therefore coverage was excluded; (4) the Policy excludes liability for personal and advertising injury arising out of Blue Cross's breach of its own contractual obligations under its provider agreements with the Verska Plaintiffs; (5) the Policy precludes an indemnity obligation because it excludes liability for bodily injury or personal and advertising injury due to Blue Cross's

failure to render professional services; and (6) the Financial Institution Endorsement of both the CGL Policy and Umbrella Policy exclude coverage for provision of professional services. A finding in favor of Atlantic on its first affirmative defense also would constitute a finding in favor of Atlantic on Count I of its Amended Counterclaim seeking a declaration that Blue Cross forfeited coverage by its untimely notice.

Blue Cross responded to Atlantic's Motion for Partial Summary Judgment with both a response brief and a related motion under Fed. R. Civ. P. 56(f) seeking additional time for discovery. In its reply, Atlantic provided an additional affidavit with further exhibits for the Court's consideration. (Dkt. 89.) After considering Blue Cross's motion to file additional authority, the Court permitted the filing of Blue Cross's Notice of Supplemental Authority and Sur-Reply. (Dkt. 103, 109, 114, and 115.)

Atlantic added to the flurry of motions by filing a Motion to Strike, as well as a Motion to Bifurcate the issues and stay discovery with respect to Blue Cross's claim for bad faith. (Dkt. 90, 87.) The Court will discuss each of the motions in turn, beginning with the Rule 56(f) motion, the motion for partial summary judgment and the motion to strike considered together, and concluding with the motion to bifurcate.

**DISPOSITION**

## 1.  Blue Cross's Rule 56(f) Motion

### A.  Rule 56(f) Standards[6]

Rule 56(f) allows a party who, for legitimate reasons, cannot by affidavit or other means present facts essential to justify opposition to an opposing party's motion under Rule 56(e) to seek by motion an extension of the time for responding to the motion. The rule requires "(a) a timely application which (b) specifically identifies (c) relevant information, (d) where there is some basis for believing that the information sought actually exists." *Sultana Resources, LLC v. Trio Gold Co.,* No. CV-06-625-BLW, 2007 WL 2993849, at *1 (D. Idaho Oct. 11, 2007) (quoting *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1129 (9th Cir. 2004)). The party submitting a Rule 56(f) motion bears the burden of showing sufficient facts establishing that the evidence sought exists and that the evidence would prevent summary judgment. *Sultana*, 2007 WL 2993849 at *1. "Mere hope that further evidence will develop prior to trial is insufficient." *Id.*

It is generally accepted in the Ninth Circuit that, where a summary judgment motion is filed early in the litigation and a party has not had a realistic opportunity to pursue discovery relating to its theory of the case, the court should freely grant a Rule

---

[6] Fed. R. Civ. P. 56 was amended effective December 1, 2010. Because the motion for partial summary judgment and the Rule 56(f) motion were filed prior to the amendment's effective date, the Court will apply the prior version of the rule.

**MEMORANDUM DECISION AND ORDER - 9**

56(f) motion. *Mangum v. Action Collection Serv., Inc.*, No. CV-05-507-BLW, 2006 WL 2224067, at *1 (D. Idaho Aug. 2, 2006). *See also Burlington Northern & Santa Fe Ry. Co. v. The Assiniboine*, 323 F.3d 767, 774 (9th Cir. 2003) (where no discovery has taken place "the party making a Rule 56(f) motion cannot be expected to frame its motion with great specificity as to the kind of discovery likely to turn up useful information, as the ground for such specificity has not yet been laid.") Nevertheless, a district court does not abuse its discretion by denying a Rule 56(f) motion where the proposed discovery would be futile. *Mangum*, 2006 WL 2224067 at *1.

## B. Blue Cross Has Not Met Its Burden

### (1) *The discovery requested is not relevant or necessary*

Blue cross seeks documents and discovery relating to the following categories:

(a) the drafting, underwriting, negotiation and placement of the Atlantic Policies, including the underwriting and placement file, underwriting presentations, coverage summaries, copies of policies and endorsements presented in the placement; (b) the meaning of the language of the Atlantic policies, including documents discussing the meaning of those terms, other CGL and Umbrella policy forms used by Atlantic/One Beacon, and the drafting history of those forms, and any sales and marketing of the Policies; (c) Atlantic's complete claim file for *Verska*; and (d) Atlantic's claims files for similar claims, and as to how its other insureds were treated under similar circumstances and policy language.

(Blue Cross's Rule 56(f) Mot. at 4, Dkt. 81.) Blue Cross claims that obtaining such documents and deposition testimony will provide evidence of the following:

(a) the Parties' intent as to what claims would [sic] covered by the Policies; (b) the Parties' intent as to the meaning of terms/language in the Policies (including the meaning of the

> undefined term 'professional services' and the professional
> services and financial institutions endorsement), (c) Atlantic's
> handling or mishandling of this claim, the basis of its
> coverage position (if any), why it delayed providing its
> coverage position to BCI for nearly six months, the basis (if
> any) of the limitations that Atlantic asserted, and (d)
> Atlantic's handling of other similar claims, including
> Atlantic's prior application of the asserted professional
> services and breach of contract exclusions.

(Blue Cross's Rule 56(f) Mot. at 4–5, Dkt. 81.)

While Blue Cross's requests might be relevant in a breach of contract case not involving an insurance contract, the existence of special rules of construction applicable to insurance contracts under Idaho law renders Blue Cross's requests irrelevant in this case. *See* Idaho Code § 41-1822[7] (requiring an insurance policy to be construed according to the entirety of its terms and conditions as set forth in the policy). Insurance contracts are adhesion contracts, not typically subject to negotiation between the parties. *Howard v. Ore. Mut. Ins. Co.*, 46 P.3d 510, 513 (Idaho 2002). Consequently, the Court is instructed to interpret the provisions consistent with what a "reasonable person" in the insured's position would have understood the language to mean. *Howard*, 46 P.3d at 513. The determination as to the plain meaning of the words used in the policy is a question of law for the Court. *Cascade Auto Glass, Inc. v. Idaho Farm Bureau Ins. Co.*, 115 P.3d 741,

---

[7] Although neither party expressly stated that Idaho state law applies, both parties relied upon Idaho law in their memoranda. Accordingly, under *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), the Court will apply Idaho state law to this diversity case.

**MEMORANDUM DECISION AND ORDER - 11**

754 (Idaho 2005) (*cited in Axis Surplus Ins. Co. v. Lake CDA Development LLC*, No. CV-07-505-E-BLW, 2008 WL 4238966 *2 (D. Idaho 2008)).

Neither party argued that the rules of construction applicable to interpretation of insurance contracts should not be applied in this case, despite the insured being an insurance company itself. Accordingly, the parties' intent as to the meaning of specific terms in the Policies, and the genesis of the policy language, is irrelevant to the Court's determination. The Court need not look beyond the four corners of the Policy itself to determine whether the terms are ambiguous as a matter of law. Similarly, how Atlantic may have interpreted its Policies in other cases is irrelevant, as the Court is instructed to examine the policy language and consider it in the context of a "reasonable person" in the insured's position. Thus, how Atlantic may have interpreted its Policies in other cases involving other insureds will not assist Blue Cross in proving its case against Atlantic. Therefore, the discovery requested in parts (a), (b), and (d) of Blue Cross's request, *supra*, is futile, as it will not lead to relevant information designed to overcome Atlantic's motion for summary judgment in this case.

This leaves one final category of discovery, encompassing Atlantic's "complete file" for the Verska Lawsuit, which Blue Cross contends will provide proof as to Atlantic's delay or mishandling of the claim in this case. The documents Blue Cross seeks in this category are the "coverage position letter" Atlantic sent to Blue Cross, documents indicating when Atlantic learned of either the Verska Claims or the Verska Lawsuit, and

facts that demonstrate a lack of prejudice as it pertains to Atlantic's defense that coverage was forfeited due to late notice.

Concerning Atlantic's *Verska* file, Blue Cross is in the unique position of having participated in the Verska Lawsuit, giving Blue Cross access to the information it supplied to Atlantic, and vice versa. For example, Blue Cross disputes that Atlantic first received notice on August 7, 2008, of the Verska Lawsuit, claiming that Atlantic may have learned of the suit from Blue Cross's E&O insurer, Darwin. (Aff. of BCI at 3, Dkt. 81-1.) Blue Cross can certainly obtain that information from Darwin. The Court has not been provided with any evidence that Atlantic obstructed Blue Cross from asking Darwin to provide information related to Blue Cross's dispute with Atlantic. Moreover, Atlantic's position is that Blue Cross failed to notify Atlantic, contrary to the Policy language requiring its insured to provide notice. Consequently, whether Atlantic learned of the Verska Lawsuit from third parties, or a local newspaper for that matter, is irrelevant to Atlantic's position in this case.

Discovery also is not necessary to the extent Blue Cross itself possesses the documents it forwarded to Atlantic. For instance, Blue Cross is in a position to know the contents of and date it received the "coverage position letter" that Atlantic sent to Blue Cross. Surely, it possesses the original letter it received from Atlantic, which Blue Cross claims was received on and dated January 15, 2009. (Aff. of BCI at 2, Dkt. 81-1.) If Atlantic now claims that it provided a different letter on a different date, Blue Cross is

entitled at this stage to introduce the letter Blue Cross claims it received instead. (*See Id.*) The Court can then determine whether the purported factual dispute is material such that summary judgment is precluded, and the issue can be brought before the jury.

Therefore, with respect to the aforementioned categories of information and documents, Blue Cross's Rule 56(f) Motion will be denied. As for documents that might prove a lack of prejudice resulting from the late notice, the Court considers that legal issue in the context of Atlantic's Motion for Summary Judgement in Section 2C below.

### (2) *Blue Cross's delays*

Atlantic argued also that the lack of discovery in this case is solely attributable to Blue Cross's inaction, and therefore Atlantic should not be penalized from proceeding with its Motion for Summary Judgment. The Court finds it unnecessary to reach Atlantic's alternative argument, finding instead that the information sought is not likely to lead to relevant evidence to present in opposition to Defendants' Motion for Partial Summary Judgment.

## 2. Motion for Partial Summary Judgment

### A. Summary Judgment Standards

Motions for summary judgment are governed by Fed. R. Civ. P. 56(c)(2), which provides, in pertinent part, that judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c)(2). A moving party may show that no genuine issue of material fact exists by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party meets the requirement of Rule 56 by either showing that no genuine issue of material fact remains or that there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). It is not enough for the [nonmoving] party to "rest on mere allegations or denials of his pleadings." *Id*. Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id*. at 250.

When determining whether a genuine issue of material fact exists, facts and inferences must be viewed most favorably to the non-moving party. To deny the motion, the court need only conclude that a result other than that proposed by the moving party is possibleunder the facts and applicable law. *Aronsen v. Crown Zellerbach*, 662 F.2d 584, 591 (9th Cir. 1981). The Ninth Circuit has emphasized that summary judgment may not be avoided merely because there is some purported factual dispute, but only when there is a "genuine issue of material fact." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 500 (9th Cir. 1992).

The Ninth Circuit has found that, to resist a motion for summary judgment, the

non-moving party:

> (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the nonmoving party's claim implausible.

*British Motor Car Distrib. Ltd. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371, 374 (9th Cir. 1989).

### B. Substantive Law Applicable to Interpretation of Insurance Contracts

Insurance policies are contracts between the insurer and the insured. *Mortensen v. Stewart Title Guar. Co.*, 2010 WL 2605798 *3 (Idaho 2010) (citing *Hall v. Farmers Alliance Mut. Ins. Co.*, 179 P.3d 276, 280 (Idaho 2008)). Whether an insurance policy is ambiguous is a question of law over which the court exercises free review. *Armstrong v. Farmers Ins. Co. of Idaho*, 205 P.3d 1203, 1205 (Idaho 2009) (citing *Purvis v. Progressive Cas. Ins. Co.*, 127 P.3d 116, 119 (Idaho 2005)) (citation omitted).

If the Court finds the policy language to be unambiguous, the Court is to construe the policy as written, "and the Court by construction cannot create a liability not assumed by the insurer nor make a new contract for the parties, or one different from that plainly intended, nor add words to the contract of insurance to either create or avoid liability." *Id.* "Unless contrary intent is shown, common, non-technical words are given the meaning applied by laymen in daily usage—as opposed to the meaning derived from legal usage—

in order to effectuate the intent of the parties." *Id.* (quoting *Howard v. Ore. Mut. Ins. Co.*, 46 P.3d 510, 513 (Idaho 2002)). Where there is an ambiguity in an insurance contract, special rules of construction apply to protect the insured. *Id.* at 1206 (citing *Hall*, 179 P.3d at 281).

When determining whether a particular provision is ambiguous, the provision must be read within the context in which it occurs in the policy. *Armstrong*, 205 P.3d at 1206 (citing *Purvis*, 127 P.3d at 119). An insurance policy provision is ambiguous if "it is reasonably subject to conflicting interpretations." *North Pac. Ins. Co. v. Mai*, 939 P.2d 570, 572 (Idaho 1997). If an ambiguity is found, and because insurance contracts are adhesion contracts that are not typically subject to negotiation between the parties, any ambiguity that exists in the contract is construed most strongly against the insurer and in favor of the insured. *Armstrong*, 205 P.3d at 1206 (citing *Arreguin v. Farmers Ins. Co.*, 180 P.3d 498, 500 (Idaho 2008)). The Court also is to construe insurance contracts "in a manner which will provide full coverage for the indicated risks rather than to narrow its protection." *Smith v. O/P Transp.*, 918 P.2d 281, 284 (Idaho 1996). "The burden is on the insurer to use clear and precise language if it wishes to restrict the scope of its coverage." *Arreguin*, 180 P.3d at 500.

## C. Analysis

### (1) *Whether Blue Cross Forfeited Coverage By Failing To Satisfy the Notice Conditions of the Policies*

#### (a) *Undisputed Facts Concerning Atlantic's Receipt of Notice*

The Court finds the following material facts, for purposes of this section of its Memorandum Decision, to be undisputed.

The Verska Plaintiffs alleged they learned from a Boise physician unaffiliated with Blue Cross of decredentialing actions taken by Blue Cross, which were not public at that time. (Blue Cross's Stmt. of Facts ¶ 35, Dkt. 82-1; Atlantic's Stmt. of Facts ¶ 9, Dkt. 61-1.) On October 25, 2007, the Verska Plaintiffs notified Blue Cross of their claims for wrongful decredentialing. (Atlantic's Stmt. of Facts 12, Dkt. 61-1; Ex. L, Dkt. 62-12.) Blue Cross hired the law firm of Hawley Troxell Ennis & Hawley to represent it in connection with these eventual claims. (*Id.*). Shortly thereafter, on December 12, 2007, Blue Cross entered into an agreement to mediate with the Verska Plaintiffs. (*Id.*) Blue Cross participated in a mediation on January 31, 2008, which ended unsuccessfully. (*Id.*)

The Verska Plaintiffs and Blue Cross continued to engage in discussions as well as an appeal of the credentialing decisions under Blue Cross's provider agreement appeal procedure. (Ex. L, Dkt. 62-12.) With respect to Dr. Verska, the appeal panel reversed Blue Cross's decision to decredential Dr. Verska. (*Id.*)

The Verska Plaintiffs then filed a lawsuit against Blue Cross on April 18, 2008. (*Id.*) On May 6, 2008, Associate General Counsel for Blue Cross notified its E&O

insurer, Darwin Professional Underwriters, Inc. ("Darwin"), of the Verska Lawsuit. (Ex. L, Dkt. 62-12; Aff. of Nichenko ¶ 5, Ex. A, Dkt. 82-2.) On October 29, 2008, Darwin acknowledged a potential for coverage of the Verska Lawsuit and agreed to pay on behalf of Blue Cross its defense fees in excess of the $1 million retention, subject to a reservation of rights. (Aff. of Nichenko ¶ 5, Dkt. 82-2.) Blue Cross continued to employ the law firm of Hawley Troxell for its defense.

Blue Cross notified Atlantic of the Verska Lawsuit on August 7, 2008, via e-mail,[8] by sending a copy of the May 6, 2008 letter it previously had sent to Darwin. (Ex. L, Dkt. 62-12; Aff. of Nichenko Ex. A, Dkt. 82-3.) According to the e-mail attaching the May 6, 2008 letter, (Ex. L, Dkt. 62-12), the letter forwarded to Atlantic does not expressly request that Atlantic provide a defense, a fact which is not disputed by Blue Cross. (Blue Cross Stmt. of Facts, Dkt. 82-1.) By November 2008, Atlantic had been provided with a copy of the Verska Complaint and Amended Complaint. (Aff. of Nichenko ¶ 7, Dkt. 82-2.) On November 3, 2008, Atlantic contacted the law firm of Hawley Troxell to obtain a status update regarding the Verska Lawsuit. (Aff. of Fleming ¶ 5, Dkt. 62-17; Aff. of Nichenko ¶ 7, Dkt. 82-2.)

---

[8] A copy of the actual e-mail transmittal does not appear to be part of the record. The only evidence that the May 6, 2008 letter was e-mailed to Atlantic appears in the header at the top of Exhibit L, Dkt. 62-12, attached to Atlantic's Motion. Several pages appear to be missing from the e-mail, as the header indicates only pages 5 and 6 of the e-mail are included in Exhibit L.

On January 19, 2009, Blue Cross received a letter dated January 15, 2009, from

Atlantic outlining Atlantic's coverage position (the "Coverage Letter"). (Aff. of Nichenko

¶ 8, Ex B, Dkt. 82-3.)[9] Under a reservation of rights, Atlantic acknowledged

> that there are allegations in the complaint that could be
> construed as oral or written publication of material that
> slanders a person or organizations or disparages a person's or
> organization's goods, products or services. For that reason,
> we will agree to participate in the defense of BCI under the
> personal and advertising injury liability coverage under a
> reservation of rights.

(*Id.*)

(b) *Request for Additional Discovery Regarding Atlantic's Receipt of Notice*

Still unresolved from Section 1, *supra*, is Blue Cross's claim that it requires

additional discovery concerning when Atlantic received notice of the Verska Claims.

Blue Cross speculates that Atlantic may have received notice from some source other than

Blue Cross earlier than August 7, 2008. However, Blue Cross has not presented any

evidence to refute Atlantic's claim that Blue Cross provided written notice of the Verska

Lawsuit to Atlantic on August 7, 2008, four months after the Verska Complaint was filed.

(Aff. of Flemming ¶ 3, Ex. Q Dkt. 62-17.) Blue Cross claims its E&O insurer, Darwin,

provided Atlantic with notice. But Blue Cross, by virtue of its relationship with Darwin,

---

[9] There appears to be a dispute about the copy of the letter Blue Cross received. The letter attached to the Affidavit of Ms. Flemming is dated January 14, 2009, and is not signed, (Aff. of Flemming Ex. B, Dkt. 62-17), while the letter attached to the Affidavit of Nichenko is dated January 15, 2009, and is signed by Ms. Flemming (Aff. of Nichenko Ex. B, Dkt. 82-3). Ms. Nichenko stated also that she received a copy of the January 15, 2009 letter via U.S. mail on January 23, 2009. The Court finds that the dispute as to the exact date of receipt is not material, as the difference is only by one day. For purposes of the Motion, the Court finds that the letter dated January 15, 2009, as attested to by Ms. Nichenko, is the letter Blue Cross received from Atlantic.

could have obtained information from Darwin to counter Atlantic's argument, and provided contrary evidence that Atlantic had constructive or actual notice of the Verska Claims prior to August 7, 2008. Blue Cross failed to do so.

Blue Cross failed also to offer evidence that it may have provided notice other than in written form, such as the verbal notice found to be sufficient in *Leach v. Farmer's Auto. Interins. Exch.*, 213 P.2d 920 (Idaho 1950). Such information was not solely in Atlantic's possession. And finally, although Blue Cross argued that sufficient information was available in the "public domain," (Response at 10, Dkt. 82), Blue Cross did not present any evidence of what was in the public domain and accessible to Atlantic, or any authority suggesting an insurer must affirmatively undertake an investigation or inquire of its insured on the basis of news paper articles, rumors or speculation.

Therefore, the Court finds no disputed issue of material fact as to when Atlantic received notice, and the Court will deny Blue Cross's Rule 56(f) Motion as it pertains to discovery designed to ferret out when Atlantic may have heard of the Verska Lawsuit from third parties.[10]

The Court's finding leaves it with the following issues to resolve concerning Blue Cross's notice to Atlantic. The first is whether there are disputed issues of material fact concerning any waiver of compliance or estoppel, also the subject of Atlantic's Motion to Strike. If Atlantic did not waive or is not estopped from asserting late notice as the basis for denial of coverage, the Court must then determine whether, according to the express

[10] The Court's finding does not preclude such discovery for other issues not resolved by this Decision.

provisions of the Policy, Blue Cross's notice to Atlantic is insufficient as a matter of law. If the Court finds the notice was insufficient, the Court must determine next whether there are disputed issues of material fact concerning Blue Cross's excuse for noncompliance and failure to cure.

Alternatively, if the Court determines that Atlantic waived or is estopped by its conduct from asserting late notice as a basis for denial of all coverage, the issue of late notice and Blue Cross's excuses become moot for purposes of forfeiture of coverage. The Court in that instance must determine whether the coverage defenses Atlantic asserts are applicable. Therefore, the Court begins with the issue of waiver and estoppel.

(b) *Blue Cross's Waiver and Estoppel Defense and Atlantic's Motion to Strike*

Atlantic seeks to strike Blue Cross's argument on pages 11–12 of its response brief wherein Blue Cross argues Atlantic waived its late notice defense by paying $600,000 in July of 2009 as defense costs and acknowledging a defense obligation. Atlantic asserts that the argument is contrary to an "express agreement as between Atlantic and BCI" as set forth in the parties' letter exchange. (Atlantic's Mot. To Strike at 3, Dkt. 90.) Atlantic argues also that Blue Cross's argument is based upon an inadmissible "fact." (Reply at 4, Dkt. 111.)

In the letters exchanged in July of 2009, Atlantic on July 22, 2009, mailed a check in the amount of $600,000 payable to Blue Cross representing what Atlantic had "determined are the necessary and reasonable defense costs incurred in the <u>Verska</u>

litigation with respect to the invoices submitted to [Atlantic] on June 17, 2009." (Aff. of Balice Ex. A, Dkt. 90-2.) In response, Blue Cross on July 29, 2009, acknowledged receipt of the check, and indicated that Blue Cross's deposit of the check "should not be construed or deemed to be an accord and satisfaction, . . . nor any concession that the $600,000 is the full 'amount justly due' BCI, nor any waiver or release of any of BCI's rights, claims, positions or relief . . . ." (Aff. of Balice Ex. A, Dkt. 90-2.) In reply, Atlantic acknowledged that it had not demanded that Blue Cross "waive or release any of its rights" were it to deposit the check, and that such a deposit would be "without prejudice to BCI's claims," and was not intended to be, nor should be construed to be, "an accord and satisfaction. . . ." (Balice Aff. Ex. B, Dkt. 90-3.) Atlantic also expressly "reserved its rights, claims, positions or relief." (*Id.*)

Fed. R. Civ. P. 12(f) permits the Court to strike "from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "Under the express language of the rule, only pleadings are subject to motions to strike." *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983). Atlantic cited no grounds upon which to strike Blue Cross's waiver and estoppel argument in its response brief. Despite citing several cases in its reply brief discussing the propriety of motions to strike in the context of whether "evidence" could be stricken on the grounds that it was inadmissible, Atlantic has not cited a single case construing Fed. R. Civ. P. 12(f) as

permitting the Court to strike material not contained in the pleadings of the case, let alone an argument in a responsive brief.

The parties' letter exchange does not appear to constitute an express agreement of anything by either party, but rather an acknowledgment that tender and acceptance of the $600,000 check was not to be construed as a waiver of any claim or defense that could be asserted by the parties. Blue Cross contends that the $600,000 payment constitutes a waiver by Atlantic of Blue Cross's breach of the notice provision. Atlantic, in turn, reserved its right to assert that Blue Cross breached the notice provision. However, Blue Cross also reserved its right to claim Atlantic, by its conduct, waived any breach. Neither party agreed that any argument was foreclosed.

In addition to the $600,000 check, Blue Cross relies upon Atlantic's conduct, specifically the Coverage Letter wherein Atlantic expressly stated:

> We acknowledge that there are allegations in the complaint that could be construed as oral or written publication of material that slanders a person or organizations or disparages a person's or organization's goods, products or services. For that reason, <u>we will agree to participate in the defense</u> of BCI under the personal and advertising injury liability coverage under a reservation of rights.

(Aff. of Nichenko Ex. B, Dkt. 82-2.) (emphasis added.) In the Coverage Letter, Atlantic stated its position that Blue Cross did not explain why it did not notify Atlantic of the Verska Claim on October 25, 2007, or notify Atlantic of the mediation or the lawsuit prior to August 7, 2008. And Atlantic reserved its right to deny a defense or indemnity

obligation due to Blue Cross having forfeited coverage by its failure to provide notice.

(Aff. of Nichenko Ex. B, Dkt. 82-2.) However, in the same letter, Atlantic did "agree to

participate in the defense of [Blue Cross] in the Verska lawsuit and pay the reasonable

and necessary defense costs incurred after the date of tender in the defense of [Blue

Cross] in the Verska lawsuit." Then, Atlantic tendered $600,000, for the "reasonable and

necessary defense costs." These facts are undisputed, and reflected in the parties'

correspondence and actions that followed.

Blue Cross argues that such conduct constitutes a waiver of its strict compliance

with the notice provision, and relies upon *March v. Snake River Mut. Fire Ins. Co.*, 404

P.2d 614, 620 (Idaho 1965). *March* stated that:

> it is generally recognized that . . . provisions in an insurance contract
> are for the benefit of the insurer and may be waived by words or
> conduct inconsistent with an intention to demand strict compliance.
> The applicable general rule is stated in 29A Am.Jur., Insurance, §
> 1430, p. 539, as follows: "Generally speaking, a course of conduct
> on the part of the insurer evidencing to the insured an admission or
> recognition of liability or assurances that an adjustment or settlement
> would be made amounts to a waiver of formal notice and proofs of
> loss or of defects therein." . . .[C]onditions of an insurance policy
> requiring the insured to furnish various notices after loss, in a
> particular manner, are for the benefit of the insurer and may be
> waived by words or conduct inconsistent with an intention to
> demand exact compliance, from which the insured is led to believe
> such compliance is unnecessary. . . .

404 P.2d at 620. Blue Cross is entitled, based upon the above reservation of rights and

conduct, to assert a defense that Atlantic is either estopped or has waived its right to rely

upon the notice of claim and suit provisions. Therefore, the Motion to Strike will be denied.

(c) *Application of Blue Cross's Waiver and Estoppel Defense*

Atlantic asserts its late notice defense as a defense to both its duty to defend and its duty to indemnify, arguing that Blue Cross forfeited all coverage. To resolve Atlantic's defense, the co-existing duties of an insurer, which are treated separately under Idaho law, must be examined. *Hoyle v. Utica Mut. Ins. Co.*, 48 P.3d 1256, 1264 (Idaho 2002). The duty to defend is triggered if the complaint reveals a potential for liability that would be covered by the insured's policy. *Hoyle*, 48 P.3d at 1264. Idaho law is well established that, where an underlying complaint alleges facts within or potentially within policy coverage, the insurer is obliged to defend its insured. *Esterovich v. City of Kellogg*, 80 P.3d 1040, 1042 (Idaho 2003). If a complaint alleges facts potentially within the policy's coverage, the insurer must either defend the suit under a reservation of rights or seek a declaratory judgment that there is no coverage. *Kootenai County v. W. Cas. and Sur. Co.*, 750 P.2d 87, 89 (Idaho 1988).

Because of the distinction Idaho law makes between the insurer's duties, even if an insurer wrongfully refuses to defend, or as alleged in this case breaches its duty to defend, it may nevertheless in a subsequent action on the policy attempt to show that liability is not covered by the policy. *Hirst*, 683 P.3d at 447. In other words, an insurer is not prevented from continuing to assert coverage exclusions or defenses with respect to its

indemnity obligation even though it may be liable for damages for breach of its duty to defend.[11] The measure of damages for breach of the duty to defend is instead based upon contract, resulting in recovery of attorney fees and costs incurred as a result of the refusal to assume the defense. *Hirst*, 683 P.2d at 447.

Accordingly, application of *Hirst* compels the conclusion that an insurer that breaches its duty to defend may on the one hand be liable for recovery of attorney fees and costs as a result of its refusal to defend, but may nevertheless assert policy defenses to its duty to indemnify. Because of these legal principles, the Court in this matter must resolve whether, under the facts of this case, Atlantic waived its right or is estopped to assert late notice as a defense to either its duty to defend, its duty to indemnify, or both. For the reasons discussed below, the Court concludes waiver and estoppel are applicable in this matter, and Atlantic has waived its right to and is estopped from asserting late notice as a basis to claim forfeiture of the Policy.

Failure to comply with the notice of suit provisions, whether a complete failure until after judgment, or late notice as is the case here, provides grounds upon which an insurer can refuse to honor its duty to defend, and consequently, its duty to indemnify. *Viani v. Aetna Ins. Co.*, 501 P.2d 706 (Idaho 1972) (no notice);[12] *State Farm Mut. Auto.*

---

[11] Idaho law is in contrast to the Illinois rule, which applies the doctrine of estoppel once an insurer has breached its duty to defend. Under Illinois law, an insurer that breaches its duty to defend is estopped from raising policy defenses to coverage, including defenses such as late-notice. *Employers Ins. Of Wausau v. Ehlco Liquidating Trust*, 708 N.E.2d 1122, 1133 (Ill. 1999). However, Idaho courts have expressly rejected the "Illinois rule." *Deluna v. State Farm Fire & Cas. Co.*, 233 P. 3d 12, 16–17 (Idaho 2008); *Hirst v. St. Paul Fire & Marine Ins. Co.*, 683 P.2d 440, 447 (Id. Ct. App. 1984).

[12] *Viani v. Aetna Ins. Co.*, 501 P.2d 706, 713 (Idaho 1972) was expressly overruled by *Sloviaczek v. Estate of Puckett*, 565 P.2d 564 (Idaho 1977), but only with respect to *Viani's* holding concerning "other

*Ins. Co. v. Cassinelli*, 216 P.2d 606, 615–616 (Nev. 1950) (delay of notice for four months excused insurer from its obligations under the insurance contract); *Miller v. State Farm Mut. Auto. Ins. Co*., 463 N.E.2d 257, 266 (Ind. 1984) (delay of notice involves forfeiture of the policy).  However, an insurer may be estopped from relying on a policy defense such as late notice, or waived its right to do so. *Underwriters at Lloyds v. Denali Seafoods, Inc.*, 729 F.Supp. 721, 726 (W.D. Wash. 1989). *See also Viani*, 501 P.2d at 714 (recognizing waiver as a defense to an assertion that notice was not given to the insurer).

To prove waiver, there must be an intentional relinquishment of a known right. *Frontier Fed. Sav. & Loan Assoc. v. Douglas*, 853 P.3d 553, 557 (Idaho 1993). Waiver may be effected by conduct attributable to the company. *Lewis v. Continental Life & Acc. Co.*, 461 P.2d 243, 250 (Idaho 1969). In insurance cases, waiver is closely akin and sometimes used interchangeably with the concept of estoppel. *Lewis*, 461 P.2d at 250. It is well settled that, if an insurer has knowledge of facts entitling it to treat a policy as no longer in force, or forfeited, and thereafter by its words or conduct treats the policy as effective, it is estopped from declaring a forfeiture. *Mull v. U.S. Fidelity & Guar. Co.*, 206 P. 1048, 1050 (Idaho 1922).[13]

---

insurance" clauses. *Viani* remains the law in Idaho concerning the issue of notice and the required showing when an insured does not comply with the notice provisions of an insurance policy.

[13] *See also Underwriters at Lloyds v. Denali Seafoods, Inc.*, 729 F.Supp. 721, 726 (W.D. Wash. 1989) (explaining that estoppel refers to a preclusion from asserting a right by an insurer where it would be inequitable to permit the assertion, and rests upon acts, statements or conduct on the part of the insurer which lead or induce the insured, in justifiable reliance thereupon, to act or forebear to act to his prejudice).

Atlantic's words and conduct constitute both waiver and estoppel of its right to assert late notice as a defense. There are three factors integral to the Court's finding of waiver and estoppel in this case. First, Atlantic's Coverage Letter was ambiguous and inconsistent with an intent to assert late notice as a complete defense to its obligations. Second, Atlantic delayed in providing Blue Cross with its coverage position. And third, Atlantic undertook steps to investigate the claim and paid for a portion of the defense costs. The Court will discuss each factor in turn.

There is no dispute that Atlantic, in its Coverage Letter sent in January of 2009, stated in writing that it would "agree to <u>participate in the defense</u> of BCI under the personal and advertising injury liability coverage under a reservation of rights," and in the same paragraph continued only to reserve its right to deny any "indemnity obligation" because the damage might not fall within the policy coverage or policy period. (Aff. of Nichenko ¶ 8, Ex B, Dkt. 82-3.) (emphasis added). The Coverage Letter further stated that Atlantic would agree "to <u>participate in the defense</u> of BCI in the *Verska* lawsuit <u>and pay</u> the reasonable and necessary <u>defense costs</u> incurred after the date of tender in the defense of BCI in the *Verska* lawsuit." (*Id.*) (emphasis added). At the time the letter was written in January of 2009, Atlantic knew Blue Cross had retained the law firm of Hawley Troxell to represent it. Then, in July of 2009, Atlantic paid Blue Cross $600,000 representing defense costs it deemed reasonable and necessary.

While Section V of the Coverage Letter set forth the lack of timely notice and resultant deprivation of the opportunity to participate in the defense prior to receiving notice, even Atlantic tacitly acknowledged that it might not have the right to deny its defense obligation under the circumstances. The Coverage Letter stated that Atlantic "reserve[d] the right to deny any defense and/or indemnity obligation under the respective policies due to BCI having forfeited coverage under the policies" on the grounds of late notice. (*Id.*) (emphasis added).[14] The meaning of the phrase "and/or" is consistent with an interpretation that Atlantic would either deny both its defense and indemnity obligation, or it would choose one, and either deny its defense or its indemnity obligation, leaving the reservation of rights based upon late notice up for interpretation. But in the very next paragraph, Atlantic stated it would agree to "pay . . . defense costs," a position entirely inconsistent with its attempt to assert lack of notice as a basis to deny coverage under its duty to defend. "Generally-worded reservations of rights are disapproved," *Specialty Surplus Ins. Co. v. Second Chance, Inc.*, 412 F.Supp. 2d 1152, 1167 (W.D. Wash. 2006), and the Court finds this particular letter deficient and inconsistent with an intent to assert late notice as a complete defense.

---

[14]  The use of the ambiguous phrase "and/or" has been "frequently condemned as improper and confusing," and at least one court has construed the phrase against the drafter. *See Newlon v. Newlon*, 220 S.W.2d 961, 963 (Ky. 1949). *See also Moran v. Shern*, 208 N.W.2d 348, 351 (Wis. 1973): "'and/or,' that befuddling, nameless thing, that Janus-faced verbal monstrosity, neither word nor phrase, the child of a brain of some one too lazy or too dull to express his precise meaning, or too dull to know what he did mean, now commonly used by lawyers in drafting legal documents, through carelessness or ignorance or as a cunning device to conceal rather than express meaning with view to furthering the interests of their clients."; *Raine v. Drasin*, 621 S.W.2d 895, 905 (Ky. 1981): "error is achieved by use of the much condemned conjunctive-disjunctive crutch of sloppy thinkers, and/or."

Second, Atlantic failed to insist on the outset its position that coverage—both under its duty to defend and duty to indemnify—was forfeited based upon lack of notice. *See Twin City Fire Ins. Co. v. Old World Trading Co.*, 639 N.E.2d 584, 590 (Ill. Ct. App. 1994) (finding an intent to waive if the insurance company is fully advised of the facts bearing on a policy defense but does not insist on noncoverage). There is no dispute that Atlantic, upon receiving notice of the Verska Complaint from Blue Cross in August of 2008, knew of the forfeiture issue based upon late notice. Suit was already underway, and the underlying claim had been in litigation for some time. Then, Atlantic waited more than five months until January of 2009 to provide Blue Cross with its ambiguous Coverage Letter that failed to take a definitive stand on the issue of Blue Cross's late notice, and simultaneously assumed a duty to defend Blue Cross. *See Twin City Fire Ins. Co.*, 639 N.E.2d at 590 (finding a long delay in asserting a policy defense an important factor in determining waiver).

Third and finally, Atlantic undertook steps to investigate the claim and paid a portion of the defense costs. Atlantic requested and received a copy of the Verska Complaint, contacted Hawley Troxell in November of 2008 for a status update, and requested information to evaluate the defense in its January 2009 Coverage Letter. *C.f. Viani v. Aetna Ins. Co.*, 501 P.2d at 714 (finding no waiver of the notice of suit provisions because the insurer "never took any steps to investigate the claim," in contrast to the facts in this case); *see also March v. Snake River Mut. Fire Ins. Co.*, 404 P.2d 614, 620 (Idaho

1965) (finding waiver of the written proof of loss provisions when the insurer investigated the claim and issued a check for the loss). Atlantic then requested copies of Blue Cross's attorney invoices, reviewed them, and paid for $600,000 in defense costs.

Atlantic cannot have its cake and eat it too. Despite its tardy attempt to assert late notice as a defense, Atlantic by its conduct waived the right to do so, and also is estopped from relying upon the policy defense of late notice. In the absence of any coverage position from Atlantic, Blue Cross had no choice but to continue on its course. Nevertheless, the defense of late notice is not related to the coverage content. *Underwriters at Lloyds*, 729 F.Supp. at 727. Therefore, although the Court finds Atlantic may not assert late notice as a bar to its duty to defend or indemnify, it still may assert its defenses to coverage under the Policy exclusions. Accordingly, the Court now turns to Atlantic's assertion of its coverage exclusions.[15]

---

[15] Because of the Court's finding, the issue of prejudice with respect to late notice, and a determination concerning the sufficiency of Blue Cross's excuses, is not necessary. However, the Court finds these issues may ultimately be relevant to Blue Cross's bad faith claim, and reserves deciding those issues if they arise at a later juncture.

(2) ***Coverage Exclusions***

Atlantic argues the merits of its coverage exclusions, which requires the Court to interpret whether the Policy provisions upon which Atlantic relies are ambiguous as a matter of law.

(a) *"Bodily Injury" Coverage Exclusion*

The Verska Complaint alleged that Blue Cross "intentionally inflicted emotional distress upon Drs. Verska and Jorgenson by improperly subjecting both Drs. Verska and Jorgenson to the probation and decredentialing process under the guise of quality of care." (Ex. J, Am. Compl. ¶ 89, Dkt. 62-10.) The Verska Plaintiffs alleged also that Blue Cross "leak[ed] the wrongful decredentialing to the Idaho medical community" in violation of Blue Cross's policies and procedures. (Ex. J, Am. Compl. ¶ 96–99, Dkt. 62-10.) Atlantic contends that both the intentional leak of information causing damages and the intentional infliction of emotional distress claim are not an "occurrence" under its Policy, because an occurrence is defined as an "accident" and intentional conduct can never be accidental. Atlantic therefore argues that Blue Cross cannot claim recovery of the settlement proceeds under the exclusion for bodily injury.

Blue Cross disagrees based upon the lack of any findings in the Verska Litigation that Blue Cross's conduct was intentional. Idaho law, according to Blue Cross, requires a finding of intent before an insurer can establish that an accident did not occur. Because Blue Cross denied that it intentionally inflicted any emotional distress or caused the leak

of information to occur, Blue Cross contends that Atlantic cannot rely upon the bodily injury exclusion.

Turning to the Policy, the CGL Policy applies to "bodily injury" only if caused by an "occurrence."[16] The Policy excludes "bodily injury" "expected or intended from the standpoint of the insured." An "occurrence" is defined in the Policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Bodily injury" is in turn defined as "bodily injury, sickness or disease sustained by a person."

The Idaho Supreme Court has had occasion to define the term "accident" in the context of a general liability policy. An "accident is an unexpected event which is the result of unintentional conduct or an intentional act which results in unexpected consequences." *State Farm Fire & Cas. Co. v. Doe*, 946 P.3d 1333, 1336 (Idaho 1997). Generally, ["w]hether an insured acted wilfully, intentionally or maliciously, relieving the insurer of liability under the policy, is a factual determination. . . The absence of such a determination precludes summary judgment for the insurer." *State Farm Fire & Cas. Co.*, 946 P.2d at 1335. By definition, the intentional infliction of emotional distress requires proof that the defendant's conduct was intentional or reckless. *Mitchell v. Gov't Emp. Ins. Co.*, No. CV06-84-S-EJL, 2007 WL 2608839 *4 (D. Idaho Sept. 4, 2007).

---

[16] The bodily injury sections are found in Section I of the CGL Policies (Ex. M, N, Dkt. 62-13, 62- 14) and Section I of the Umbrella Policy (Ex. O, Dkt. 62-15 at10). In all material respects, the provisions and definitions of the three policies use identical language.

Blue Cross misses the mark. The Court is instructed to focus on the Verska Complaint to ascertain whether it alleges an occurrence under the Policy that would trigger Atlantic's duty to defend. *Deluna v. State Farm Fire & Cas. Co.*, 233 P.3d 12, 16 (Idaho 2008). While the duty to defend arises upon the filing of a complaint whose allegations, in whole or in part, read broadly, reveal a potential for liability, the "duty to indemnify is triggered only where an insurance company would be obligated to pay the underlying action regardless of how it fulfilled its duty to defend." *Deluna*, 233 P.3d at 16; *Construction Mgt. Sys., Inc. v. Assurance Co. of Am.*, 23 P.3d 142, 145 (Idaho 2001). If the matters alleged in the complaint are resolved not by a trial, but rather by settlement, the court is not precluded from finding that the insurer breached its duty to defend by examining the allegations in the complaint broadly, but in the same opinion determining the insurance company was not liable for the settlement because the actions alleged in the complaint were not covered by the terms of the policy. *Deluna*, 233 P.3d at 17 (citing *Hirst*, 683 P.2d at 442).

*Hirst* illustrates the above principle that factual findings from the underlying action are not necessary for the Court to determine whether the insurer must indemnify its insured. In *Hirst*, the insurer refused to defend its insured, a physician, against claims that the doctor had committed malpractice, was negligent, committed sexual acts upon his patient, and prescribed contra-indicated drugs to render the patient more susceptible to the doctor's sexual advances. The matter settled, and a lawsuit ensued against the insurer.

The court upheld the district court's grant of summary judgment to the insured regarding the duty to defend, finding that, read broadly, the allegations in the complaint alleged facts which, if proven, "could have brought" the case within the coverage of the policy. *Hirst*, 683 P.2d at 443, 445.

However, the court also upheld the district court's grant of summary judgment to the insurer regarding the duty to indemnify, finding that the underlying allegations of the complaint did not fall within the policy provisions. *Hirst*, 683 P.2d at 444. All the court had before it were the allegations in the complaint, because the underlying lawsuit had been resolved via settlement. *See Deluna*, 233 P.3d at 17 (noting that *Hirst* was decided upon summary judgment and found that the insurer had breached its duty to defend, but simultaneously found that the insurer was not liable for the settlement "because the actions alleged in the complaint were not covered by the terms of the policy").

Therefore, contrary to Blue Cross's argument, the Court need not look beyond the allegations in the Verska Complaint. *See Idaho Counties Risk Mgt. Program Underwriters v. Northland Ins. Co.*, 205 P.3d 1220, 1225 (Idaho 2009) (finding that the district court "correctly focused on the . . . complaint[] to ascertain whether they alleged an actual occurrence under the policy that would trigger [the] duty to reimburse.") If the allegations in the complaint allege intentional acts not covered by the policy, the court may find that the policy did not provide coverage even though it may also conclude that the insurer was required to provide a defense.

In this case, the Verska Complaint alleges intentional infliction of emotional distress, which by definition requires the performance of an intentional act. Although noted in a footnote, the court in *Northland* stated that a policy with similar language defining an occurrence as an accident would not provide coverage for intentional acts such as intentional infliction of emotional distress alleged in the complaint. *Northland Ins. Co.*, 205 P.3d at 1228 n.3. Other jurisdictions have held that intentional infliction of emotional distress claims by nature do not involve accidental conduct. *Schorno v. State Farm Fire and Cas. Co.*, No. C09-5778 RBL, 2010 WL 3119449 (W.D.Wash. Aug. 3, 2010); *RLI Ins. Co. v. Thompson*, No. 09-00345 SOM/BMK, 2010 WL 1438925 (D. Haw. Apr. 12, 2010) (allegations of intentional conduct are not accidental and therefore do not constitute an occurrence under the policy).

Based upon the above authorities, the Court finds, as a matter of law, that the allegation of intentional infliction of emotional distress contained in the Verska Complaint is not covered by the Policy. The Verska Complaint alleges intentional infliction of emotional distress as a result of the improper credentialing process. Based upon the allegations, the Verska Complaint alleges intentional, rather than accidental, conduct. Therefore, no indemnity coverage is provided by the Policy. The Court makes no finding concerning Atlantic's duty to defend with respect to the intentional infliction of emotional distress claim.

But Atlantic argued also that Blue Cross "intentionally" leaked the wrongful decredentialing to the Idaho medical community, contending that the intentional leak was somehow part of the emotional distress claim. However, the Verska Complaint does not contain such an allegation within its claim for emotional distress, but rather bases its emotional distress claim upon the motives behind the decredentialing process. In addition, when setting forth the facts concerning the leak, the Verska Complaint does not allege the leak was intentional, only that before hearing from Blue Cross about the credentialing decision, Dr. Verska "learned from a Boise physician that he had been decredentialed" by Blue Cross. (Ex. J, Am. Compl. ¶ 60, Dkt. 62-10.) There is no allegation that the leak was intentional, other than the inference that, because only Blue Cross knew of the proceedings, it had to have come from someone employed by or affiliated with Blue Cross. Therefore, based upon the record, the Court makes no finding whether the leak was intentional or accidental.

(b) *Professional Services Exclusion*

The Verska Complaint alleges injuries arising from Blue Cross's credentialing policies and procedures. (Ex. J, Am. Compl. ¶ 96, Dkt. 62-10.) Atlantic claims that Blue Cross is performing a "professional service" when it provides peer review and credentialing services to the physicians it contracts with as participating providers. Atlantic argues that confidentiality is a required component of the peer review and credentialing process. Accordingly, Atlantic contends that the exclusion for "bodily

injury" or "personal and advertising injury" due to the "rendering of or failure to render any professional services" precludes Blue Cross's claims for indemnity.

Blue Cross argues that the "professional services" exclusion cannot be read so broadly so as to include any and all activities Blue Cross performs. Because anyone could have "leaked" the confidential information, and it was never established who made the disclosure, the mere fact that a rumor may have been started is not, Blue Cross contends, a "professional service." Further, Blue Cross contends that if Atlantic's definition of "professional service" were accepted, it would render the protection afforded by the Policy for "advertising injury," which is defined as oral publication of material that damages a person's reputation, a nullity. Finally, Blue Cross points out that another portion of the professional service exclusion is found in the "Financial Institutions Endorsement," which Blue Cross contends does not apply to it.

Under Coverage B, Atlantic's Policy states it will "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." Personal and advertising injury is defined as injury "arising out of . . . oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services[.]" However, coverage is excluded for "personal and advertising injury caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict personal and advertising injury." In addition, an endorsement to

the Policy indicates the insurance coverage does not apply to "bodily injury" or "'personal and advertising' injury due to the rendering of or failure to render any professional service." (Ex. N, Dkt. 62-14.)

The Court finds the Policy language to be ambiguous. It is incumbent upon the insurer to use clear language if it wishes to restrict coverage. In general, terms used within the Policy are defined, but "Professional Service" is not defined in the one page endorsement attached to the Policy. If one looks at the services Blue Cross provides, it is generally in the market to provide health care services in the form of health insurance to its insureds through provider networks. As part of such services, health care providers participate in Blue Cross's provider network via "provider agreements." Physicians who participate in the provider network must be "credentialed," and Blue Cross maintains policies and procedures to credential physicians consistent with Medicare regulations. (*See* Mem. in Opposition at 2, Goodsir Aff. Ex. K, Dkt. 82-11.)

If the Court defines Blue Cross's services in this manner, it is not clear whether "credentialing services" constitute a "professional service," because the credentialing of physician providers is an activity ancillary to the main service Blue Cross provides. The main purpose of Blue Cross's services is providing health care services, in the form of insurance, to its insureds. To deliver that service, Blue Cross engages in various other activities, including maintenance of a high quality pool of "credentialed" physicians as

part of its provider network. But credentialing of physicians is not, as the Court views it, Blue Cross's main service.

Moreover, the Court is to construe the terms of the Policy so as to provide full coverage. If the information leak is considered an "advertising injury arising out of publication of material that disparages an individual's services," then the exclusion for credentialing services could conceivably swallow the coverage provided by the coverage for advertising injuries. For example, if published material seeking to recruit physicians to participate in Blue Cross's provider network contained disparaging remarks, the logical conclusion of Atlantic's argument would be that such an injury would be excluded because the publication was directly related to its "credentialing activities," in this case generating candidates for its provider network.

Finally, the principal case cited by Atlantic is distinguishable. In *U.S. Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, the insured hospital was sued for negligent credentialing of a physician. 716 N.E.2d 1201 (Ohio Ct. App. 1998). In that case, the Ohio court ruled that the professional services exclusion in the hospital's insurance policy precluded coverage because "credentialing" is part of the professional service performed by the hospital. *U.S. Fid. & Guar. Co.*, 716 N.E.2d at 1206. In contrast, the Verska Complaint did not allege a cause of action for "negligent credentialing," only that the leak, along with other irregularities in the credentialing procedure, constituted a breach of contract.

More problematic is the unknown nature of the information leak. *U.S. Fid. &*

*Guar. Co.* held also that if a loss for which an insured seeks coverage

> results from two or more causes, at least one of which is
> covered under the insurance policy and at least one of which
> is excluded, coverage will extend to the loss, provided that the
> cause of loss covered under the policy is independent of the
> excluded cause of loss. The covered cause of loss is
> independent of the excluded cause of loss only when the
> covered cause of loss (1) provides a basis for a cause of action
> in and of itself and (2) does not require the occurrence of the
> excluded risk to make it actionable.

716 N.E.2d at 1205–06. The Verska Complaint does not specify who, if anyone, at Blue

Cross leaked the information. Dr. Verska simply alleges he heard he was no longer

credentialed as a participating provider with Blue Cross from another Boise physician.

The parties do not point the Court to any evidence in the record concerning who at Blue

Cross, if anyone, disclosed the information to the Boise physician. In the Verska Lawsuit,

Blue Cross denied anyone employed by it or connected with the credentialing activities

leaked the information. Conceivably, the custodian could have come across the

information accidentally and "leaked" it to someone else. Or the information leak could

have spread from employee gossip. In such a case, it cannot be said that the information

leak arose out of the credentialing process.

Therefore, the Court both finds the Policy ambiguous, and concludes that there is

insufficient evidence in the record and on the face of the Verska Complaint to determine

the issue of indemnity coverage and the exclusion for professional services upon summary judgment.[17]

### (c) *Breach of Contract Exclusion*

The Verska Complaint alleged that the "decredentialing of Drs. Verska and Jorgenson and [Blue Cross's] continual violations of its own policies and procedures were a breach of the provider agreements by [Blue Cross] and its duties of good faith and fair dealing. As a result of [Blue Cross's] breach, Drs. Verska and Jorgenson have been damaged in an amount to be proven at trial." (Ex. J, Am. Compl. ¶ 97, Dkt. 62-10.) Atlantic relies upon its "breach of contract" exclusion, which excludes from coverage "personal and advertising injury" arising out of a breach of a contract. Atlantic contends that the allegations of breach of the credentialing procedures constituted a breach of its provider agreements, and therefore the Verska Plaintiffs' injuries "arose out of" Blue Cross's breach of its own agreement.

With reference to the same quoted language in the preceding section, Coverage B providing coverage for personal and advertising injury excludes coverage for an injury "arising out of a breach of contract, except an implied contract to use anther's [sic] advertising idea in your 'advertisement.'" (Ex. N, Dkt. 62-14.) For the same reasons

---

[17] But the Court notes that "if indemnification depends upon the existence or nonexistence of facts outside of the complaint that have yet to be determined, the insurer must provide a defense until such time as those facts are determined, and the claim is narrowed to one patently outside the coverage." *Kootenai County v. Western Cas. & Sur. Co.*, 750 P.2d 87, 90 (Idaho 1988). Because the Verska Complaint was settled, the facts concerning the leak have not been determined, and the issue is not before the Court upon Atlantic's motion for partial summary judgment.

discussed above with respect to the professional services exclusion, the Court concludes that there is insufficient evidence in the record and on the face of the Verska Complaint to determine the issue of indemnity coverage and the exclusion for breach of contract upon summary judgment.

(3) ***Whether Atlantic Owes Pre-Tender Defense Costs***

There appears to be no dispute that Blue Cross requested payment of all its defense costs incurred in defending the Verska Lawsuit. Atlantic claims that, according to its calculations, Blue Cross incurred $217,335.58 in defense fees prior to tendering the defense to Atlantic. (Stmt. of Facts at 19, Dkt. 60-1.) Blue Cross, although not directly disputing Atlantic's figure, contends that the date Atlantic first received notice has "yet to be discovered or established." However, the Court previously found that there is no disputed issue of material fact that Atlantic first received written notice from Blue Cross on August 7, 2008, and denied additional discovery concerning that issue at this time.

Blue Cross also notes that Atlantic paid $600,000 for what Atlantic "believed was the reasonable and necessary defense costs incurred by BCI," with no provision that these costs represented post-tender costs only. While the July 22, 2009 letter enclosed with the check indicated that the payment represented the reasonable and necessary costs "with respect to the invoices submitted to Atlantic on June 17, 2009," Atlantic clarified in a follow-up email on July 29, 2009, that the amount is "representative of the necessary and reasonable post-tender defense costs incurred . . ." (Aff. of Balice Ex. A, Dkt. 90-2; Ex B,

Dkt. 90-3.) (emphasis added). Accordingly, the Court finds that Atlantic expressly

represented the $600,000 payment was intended for post-tender defense costs incurred

after August 7, 2008, and that Atlantic's unopposed figure referencing Blue Cross's

defense invoices is undisputed. (*See* Ex. W, Dkt. 23–24.)

The Policy's voluntary payment provision states "[n]o insured will, except at that

insured's own cost, voluntarily make a payment, assume any obligation, or incur any

expense, other than for first aid, without our consent." (Mem. at 19, Dkt. 60.)[18] Atlantic

relies upon *Norco Windows, Inc. v. Hartford Cas. Ins. Co.*, No. 1:05-cv-468-LRS, slip.

op. at 11–12 (D. Idaho Nov. 6, 2007), which held that the insurer did not have to pay

defense fees and costs incurred by the plaintiff prior to tender of the actions to defendant

under such a provision, or simply on the grounds that policy coverage is not triggered

until notice is given. Blue Cross argues that the law in Idaho is not clear on this issue, and

that other jurisdictions, under circumstances indicating the pre-tender payments were

involuntary, do award such costs.

The Court in *Norco* acknowledged that the Idaho Supreme Court has not decided

the issue of recovery of pre-tender defense costs. *Norco Windows, Inc.*, slip op. at 12.

However, the Court relied upon the general rule that "most courts have held an insurer is

not liable for pre-tender defense fees and costs because the policy coverage is not

triggered until such notice is given, and until the policy coverage is triggered, defense

---

[18] This provision is found in the CGL Policies at Section IV (Ex. M, Dkt. 62-13 at 13; Ex. N, Dkt. 62-14 at 12) and with slightly different language at Section IV of the Umbrella Policy (Ex. O, Dkt. 62-15 at 18).

fees and costs are not covered." *Id.* at 11. The Court, consistent with *Viani*, held that prejudice to the insurer was irrelevant. *Id.* at 12.

Other jurisdictions deciding the issue have concluded the same. Interpreting an identical provision, the court in *Tradewinds Escrow, Inc.v. Truck Ins. Exch.*, 118 Cal. Rptr.2d 561, 565 (Cal. Ct. App.2nd 2002) held that voluntary payment clauses "bar reimbursement for pre-tender expenses based on the reasoning that until the defense is tendered to the insurer, there is no duty to defend." However, despite such clauses, pre-tender expenses "are not barred if they were incurred involuntarily. Generally, voluntariness is a question of fact." *Tradewinds Escrow, Inc.*, 118 Cal. Rptr. 2d at 565. Only if the facts are undisputed may the court decide the matter as one of law. *Tradewinds Escrow, Inc.*, 118 Cal. Rptr. 2d at 566.

The *Tradewinds* court explained that payments may be involuntary where "the circumstances of the case show the payments were out of the insured's control. 'This situation might occur where the insured is unaware of the identity of the insurer or the contents of the policy.'" *Tradewinds Escrow, Inc.*, 118 Cal. Rptr. 2d at 566. For example, if an insured is compelled to incur pre-tender defense costs immediately to protect their legal interests, such costs are considered involuntary. *Fiorito v. Sup. Ct.*, 277 Cal. Rptr. 27, 30 (Cal. App.4th 1990). On the other hand, when the insured knew of the policy, had time to review the policy and investigate the claims, and simply took its time in notifying

the insurer, the provision prevented recovery of pre-tender costs. *Tradewinds Escrow,*

*Inc.*, 118 Cal. Rptr. 2d at 566.

The Court adopts the reasoning in *Tradewinds*, given Idaho courts consider

equitable principles and permit consideration of excuses for untimely notice under *Viani*.

In this case, there was a four month delay, occasioned by Blue Cross's failure to realize

the Atlantic Policies might provide coverage. Meanwhile, Blue Cross had tendered the

claim to Darwin, its E&O insurer, and had hired counsel early on to protect its interests

against the claims by the Verska Plaintiffs. The Court declines to find that mere delay in

notice precludes recovery of pre-tender defense costs in this case.

Nevertheless, the Court finds that Blue Cross's pre-tender defense costs were

incurred voluntarily. Blue Cross chose to hire its own defense counsel in October of 2007,

when the Verska Plaintiffs first notified Blue Cross of their claims. Blue Cross elected at

that time to handle the matter without involving any of its insurers. Only after the Verska

Plaintiffs filed suit on April 18, 2008, did Blue Cross tender the claim to Darwin on May

6, 2008. Blue Cross was still utilizing the services of Hawley Troxell, and continued to do

so throughout the litigation. Under these facts, the Court finds there is no disputed issue

of material fact, and declines to find that Blue Cross's pre-tender payments to Hawley

Troxell were anything other than voluntary. This was not an instance where the defense

had to begin before the insured identified the insurer. Rather, this was a case where Blue

Cross deliberately chose not to tender its defense to its insurers until an actual lawsuit was filed on April 18, 2008, after incurring attorney fees beginning in October of 2007.

While there could be some argument that Blue Cross should be entitled to reimbursement for pre-tender costs incurred from April 18, 2008, the time the Verska Complaint was filed, up until it tendered the defense to Atlantic in August of 2008, because it had an excuse for late notice, the Court declines to consider Blue Cross's excuses applicable to the issue of pre-tender reimbursement in this case. Blue Cross made a deliberate decision to handle the matter privately, without any insurance company involvement, from October of 2007 up through May of 2008, some seven months of litigation. Blue Cross certainly knew it had coverage, because upon the filing of the Verska Complaint, Blue Cross tendered the claim to Darwin. The Court therefore declines to find Blue Cross's excuses for its delay in notifying Atlantic applicable in this instance.

Summary judgment will therefore be granted with respect to Atlantic's claim that it does not owe Blue Cross reimbursement for defense costs incurred prior to August 7, 2008, in the amount of $217,335.58.

### 4.  Defendants' Motion to Bifurcate and Stay Discovery on Plaintiff's Bad Faith Claim

Atlantic moves to bifurcate and stay discovery of Count IV of the Second Amended Complaint, which states a claim for bad faith. Atlantic argues that, to state a claim for bad faith under Idaho law, there must first be a determination that coverage exists under the policy. Because Atlantic is asserting it is entitled to summary judgment

on issues of coverage under the policy, and its counterclaims assert lack of coverage, Atlantic contends that bifurcation of the bad faith claim and a stay of discovery will prevent unnecessary and wasteful discovery on the issue should Atlantic prevail on its coverage issues. (Mem. at 3, Dkt. 81-1.) Atlantic argues that judicial economy would be best served by such a stay and cites Fed. R. Civ. P. 42(b) in support of its argument.

Blue Cross contends that bifurcation is unnecessary, because its bad faith allegations involve Atlantic's defense obligations and are independent of its indemnity obligations. Further, Blue Cross asserts that Fed. R. Civ. P. 42(b) addresses bifurcation of trials, not discovery, as Atlantic seeks here. (Response at 2–3, Dkt. 100.) Blue Cross argues that it should be permitted to resolve all issues in a single proceeding, and that when the issues are intertwined, bifurcation of discovery is not advisable. (Response at 7, Dkt. 100.)

Fed. R. Civ. P. 42(b) addresses separate trials, not discovery, and permits the Court for convenience, to avoid prejudice, or to expedite and economize, to order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims. Therefore, Fed. R. Civ. P. 42(b), and the cases Atlantic cited with reference to Rule 42(b), are not applicable to Atlantic's request, because the Rule does not apply to bifurcation of "discovery," only trials.

The Court considers the issues with respect to coverage and bad faith, at least for discovery purposes, to be intertwined such that bifurcation in the discovery stage would

be inconvenient and needlessly complicated. At the hearing when the Court inquired of counsel how issues with respect to discovery would be decided if bifurcation was permitted, counsel indicated any dispute would require court intervention. The Court does not believe use of its time, or the litigants' resources, would be best served by bifurcation at the discovery stage. If and when it becomes necessary to determine whether the trial should be bifurcated, the parties may file an appropriate motion for the Court's consideration. The motion to bifurcate will be denied.

## CONCLUSION

Based upon the foregoing discussion, the Court concludes that Atlantic's motion for partial summary judgment will be granted, in part, with respect only to: (1) its claim it does not owe pre-tender attorneys' fees and expenses to Blue Cross; and (2) that there was no coverage obligation to Blue Cross related to the Verska Plaintiffs' claim of intentional infliction of emotional distress. The Court finds that Atlantic waived and is estopped from asserting late notice as grounds for forfeiture of coverage under the Policy. However, the issue of Blue Cross's late notice may be relevant as it relates to Blue Cross's bad faith claim and Atlantic's defenses thereto. The remainder of the motion for partial summary judgment, as well as Blue Cross's Rule 56(f) motion and Atlantic's motions to strike and for bifurcation, will be denied.

# ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

(1) Defendants' Motion for Partial Summary Judgment (Dkt. 59) is **GRANTED IN PART AND DENIED IN PART.**

(2) Plaintiff's Rule 56(f) Motion in Opposition (Dkt. 81) is **DENIED**.

(3) Defendants' Motion to Bifurcate and Stay Discovery on Plaintiff's Bad Faith Claim (Dkt. 87) is **DENIED.**

(4) Defendants' Motion to Strike (Dkt. 90) is **DENIED**.

DATED: January 19, 2011



Honorable Candy W. Dale
Chief United States Magistrate Judge